Gisele MROZ, Individually and as Administratrix of the Estate of Phil A. Santos, an infant, Plaintiff,

v.

CITY OF TONAWANDA, Unknown Agents, or employees of Defendant City of Tonawanda, Defendants.

No. 96–CV–403C(F).

United States District Court, W.D. New York.

March 31, 1998.

Tronolone & Surgalla (Daniel G. Tronolone, John B. Surgalla, of counsel), Buffalo, NY, for Plaintiff.

Harris, Beach & Wilcox (Charles E. Graney, of counsel), Hamburg, NY, for Defendants.

## DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

A consent to proceed before a magistrate judge, pursuant to 28 U.S.C. § 636(c), was filed on February 11, 1997. The matter is presently before the court on Plaintiffs motion for leave to file a second amended complaint (Doc. # 7) filed January 31, 1997; Defendants' cross-motions for summary judgment and dismissal of the complaint or to compel discovery (Doc. # 10) filed February 28, 1997; Plaintiff's cross-motion for partial summary judgment (Doc. # 23) filed April 30, 1997; Plaintiffs motion to amend the scheduling order (Doc. # 28) filed June 4, 1997; Plaintiff's motion to compel and extend the period within which to identify experts (Doc. # 30) filed July 31, 1997; Plaintiff's motion to amend the scheduling order (Doc. # 34) filed September 30, 1997; and Defendants' motion for summary judgment (Doc. # 36) filed November 14, 1997.

### BACKGROUND

On February 5, 1994, Phil A. Santos ("Santos"), 16, killed himself with a single blast from a shotgun following an encounter with the City of Tonawanda Police Department. Plaintiff, Gisele Mroz ("Mroz"), Santos's mother, was appointed administratrix of her son's estate on January 30, 1996. Thereafter, on February 2, 1996, Plaintiff filed in New York Supreme Court a summons and complaint on behalf of herself and her deceased son's estate.[1] The complaint alleged a claim for common law negligence and claims for violations of Santos's civil rights under 19 U.S.C. §§ 1983 and 1988, specifically the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments based on Defendants' arrest of Santos on February 5, 1994, and their failure to properly respond to a telephone call asserting Santos had threatened suicide. On February 2, 1996, Plaintiff served a notice of claim upon Defendant City of Tonawanda ("City" or "City of Tonawanda") as required by state law. (Affidavit of Proof of Service, Exhibit C to Plaintiff's Attorney Affidavit). However, neither the summons nor the complaint were ever served upon Defendants.

Thereafter, on May 31, 1996, Mroz filed and served an amended complaint in which Defendants were charged with wrongful death, negligence and various intentional torts based on state law. Plaintiff also reasserted the § 1983 claims. All of Plaintiffs claims arise out of the encounter between Santos and the Defendant City of Tonawanda's police officers. Defendants removed the case, pursuant to 28 U.S.C. § 1441, by petition filed June 19, 1997. In their answer, filed the same date, Defendants asserted several defenses, including the statute of limitations.

---

1. The only copy In the record of the original Complaint filed in New York Supreme Court is attached as Exhibit A to Plaintiff's Attorney Affidavit in Opposition to Defendants' Cross Motions ("Plaintiff's Attorney Affidavit") (Doc. # 18), filed March 27, 1997. The face of that copy of the Complaint bears a date stamp indicating that it was filed on February 5, 1996. A handwritten notation, however, indicates the Complaint was filed on February 2, 1996. That notation is initialed by "RRC." Neither party has explained this discrepancy nor further identified "RRC." The court's determination of the instant motions is not affected by whether the original complaint was filed on February 2, 1996 or on February 5, 1996 and, as neither party has raised it as an issue, the court will not further address the matter, but will, in the interest of consistency, refer to the original Complaint as having been filed on February 2, 1996.

## FACTS[2]

To borrow the words of Chief Justice Rehnquist, "[t]he facts of this case are undeniably tragic."[3] On the evening of Saturday, February 5, 1994, Plaintiff gave Santos permission to go to a local roller skating rink with his friend José Ortiz and another boy. As Plaintiff had planned to attend a movie, she expected Santos to be home by 11:00 P.M. According to Plaintiff, Santos was well behaved with no history of emotional or mental problems. Affidavit of Plaintiff Gisele Mroz in Opposition to Defendants' Cross Motions ("Mroz Affidavit"), Attached to Plaintiff's Attorney's Affidavit in Opposition to Defendants' Cross Motions (Doc. # 18), filed March 27, 1997, ¶¶ 7, 9, 10.

Later that evening, the Defendant's police department received a telephone call from Gary Kasprzak, a resident of the City of Tonawanda, who lived at 471 Broad Street. Exhibit D to Defendants' Statement of Undisputed Facts, filed February 28, 1997 (Doc. # 12) ("Police Report").[4] The information received from Kasprzak was that a young woman had just come to his house complaining that she had been confronted by "a black or hispanic male" wearing a long brown coat and hat who brandished a hand gun. Police Report. The caller also stated that the male was last seen walking on Wheeler Street toward Fletcher Street. Police Report.

Lieutenant Daniel Thiebolt the police officer who responded to the call, stated that, according to the report, the woman who made the complaint to Kasprzak was "extremely frightened." Affidavit of Daniel M. Thiebolt ("Thiebolt") ("Thiebolt Affidavit"), Exhibit C to Defendants' Statement of Undisputed Facts (Doc. # 12), ¶ 3. On the way to investigate the incident as described in Kasprzak's call, Thiebolt met Kasprzak who told Thiebolt he had seen two young Hispanic males near Fletcher and Bouck Streets fitting the description given by the woman. Thiebolt Affidavit, ¶ 3. Thiebolt intercepted the boys, exited his car, and questioned them regarding the complaint. Thiebolt Affidavit, ¶ 6; Police Report. Upon determining that one of the boys matched the description given by Kasprzak, Thiebolt then "checked" the boys and seized what later proved to be a starter pistol from Santos, the boy who matched the description, who had immediately admitted to Thiebolt that he had the pistol. Police Report; Thiebolt Affidavit, ¶ 7. Upon deciding that there was reason to "detain" Santos on state harassment and menacing charges, Santos was handcuffed and transported to police headquarters.[5] Thiebolt Affidavit, ¶¶ 8, 9, 11. However, as the woman who had sought Kasprzak's assistance was unwilling to sign a formal complaint, no charges were filed against Santos. Thiebolt Affidavit, ¶ 15.

During his contact with Santos on Fletcher Street and while at the police station, Thiebolt observed that Santos was polite and courteous, and exhibited no signs of emotion. Deposition Testimony of Daniel Thiebolt, ("Thiebolt Deposition") Exhibit D to Defendants' Motion for Summary Judgment (Doc. # 36), filed November 14, 1997, at 27. According to Thiebolt, Santos's respectful conduct during the investigation made it unnecessary to apply any physical force to Santos. Id.; Thiebolt affidavit at 3, ¶ 14.

Upon their arrival at the City of Tonawanda police headquarters, Santos and Ortiz were placed in a booking room where they

---

**2.** The facts are taken from the motions and other papers filed by the parties.

**3.** *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 191, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

**4.** According to the Report, the call was received at 2044 hrs., 8:44 P.M. According to the statement of José Ortiz, dated July 31, 1996, see Exhibit F to Affidavit of John B. Surgalla, Esq., in Opposition to Defendants' Cross–Motion for Summary Judgment, filed March 27, 1997 (Doc # 18) at 3, the encounter between Santos and the police occurred about 8:00 P.M. No explanation has been provided to court to account for this discrepancy. However, the tape recorded police radio transmission revealed that the call for assistance was received at 7:25 P.M. and that the suspects were In custody from 7:41 P.M until 8:58 P.M. Affidavit of Lieutenant Charles C. Kisloski, ("Kisloski Affidavit"), attached as Exhibit F to Defendants' Notice of Motion (Doc. # 36), filed November 14, 1997, ¶ 7, and annexed notes.

**5.** Ortiz was also taken to police headquarters, however, no explanation appears in the record for the decision to take Ortiz into custody.

were administered Miranda warnings and advised to call their parents.[6] Thiebolt Affidavit at 27, 37. According to police officer Reiss, who assisted Thiebolt in the investigation, neither boy was able to reach his parents. Deposition of Peter J. Reiss ("Reiss Deposition"), Exhibit E to Defendants' Motion for Summary Judgment (Doc. #36), filed November 14, 1997, at 13. Reiss recalled that Santos displayed no emotion and thought Santos would have been "more nervous than he was" considering the problem for which he was being investigated. Reiss Deposition at 18. After it was determined that Santos would not be charged, he and Ortiz were told by Thiebolt that they were free to go. Thiebolt Deposition at 32. According to Thiebolt, Ortiz immediately left the building and, after "everything was explained" to Santos, he was offered a ride home. Id. at 32–33.

In support of her claims, Plaintiff relies on a statement made by Ortiz on July 31, 1995 in which Ortiz describes the events by which he and Santos were taken into police custody on February 5, 1994, the event which Plaintiff maintains precipitated Santos's suicide. Statement of José Ortiz ("Ortiz Statement"), Exhibit F to Plaintiff's Attorney Affidavit in Opposition to Defendants' Cross Motions (Doc. #18), filed March 27, 1997.[7] According to Ortiz, the police officer who arrested Ortiz and Santos placed them against the patrol car and threatened to shoot them if they did not keep their heads down. (Ortiz Statement at 3–4). Ortiz also stated that the officer slammed Santos's head into the hood of the patrol vehicle when Santos attempted to apologize for threatening the woman with the toy gun. (Ortiz Statement, at 12–13, 23, 24, 45). Ortiz further stated that Santos was

extremely upset with the incident and was nervous, shaking and crying in the back of the patrol car while en route to the Tonawanda police headquarters where, after his arrival, Santos continued to cry. (Ortiz Statement, at 8, 13, 21, 34). According to Ortiz, Santos began to cry after the police slammed Santos's face against the patrol car and continued to cry when the police told them they would be going to jail. (R. 42). Ortiz indicated that Santos believed he was going to jail and that his parents would be very upset with him, (Ortiz Statement at 8–10), and that Santos stated he was going to kill himself. (Ortiz Statement, at 19, 38, 43). According to Ortiz, Santos's emotional state was evident to the police officers. (Ortiz Statement, at 13). Ortiz also stated that the police officers told them that he and Santos would be going to jail if found guilty. (Ortiz Statement, at 36, 41). When Ortiz last saw Santos before being released from the police station, Santos was still crying and shaking. (Ortiz Statement, at 34). Ortiz believed the police officers did not like him or Santos and treated them badly because Ortiz and Santos were Hispanic. (R. 39–40, 44–45).

Lieutenant Boldt, the shift lieutenant, then drove Santos to his home at 205 Wheeler Street. Deposition of Herbert F. Boldt ("Boldt Deposition"), Exhibit B to Defendants' Motion for Summary Judgment (Doc. #36), filed November 14, 1997, at 33. Upon escorting Santos to the door of the house, Boldt told Santos he should stay in the house and tell his stepfather what "he got into" and that his stepfather could "probably expect a call from the police." Id. at 10.[8] At that point, Santos said "goodnight" and, using a key, entered the house. Id. at 10. Boldt described Santos as "very courteous" and

---

6. A copy of the video tape ("the video tape") of Santos and Ortiz at the City of Tonawanda Police Headquarters was submitted as Exhibit B to Declaration of Charles E. Graney, Esq., in Opposition to Plaintiff's Motion to Amend Complaint and in Support of the Defendants' Amended Cross–Motion for Summary Judgment and Defendants' Cross–Motion to Dismiss or Compel Responses to Discovery Demands ("Graney's Declaration in Support of Summary Judgment") (Doc. #21), filed April 10, 1997, by Defendants and has been reviewed by the court.

7. However, as discussed, infra, at 457–58, the Ortiz statement was not sworn to and therefore

cannot support Plaintiff's claims in opposition to Defendants' summary judgment motions.

8. Boldt's deposition suggests that there where other people in the car with Santos and that Boldt escorted "them" to the door and "told them" what Santos's stepfather should be advised of. Id. However, Boldt later stated that "there was no one else present" when he dropped Santos off. Id. at 10–11. Neither party has given any explanation for this apparent discrepancy.

"not crying." *Id.* at 10. Boldt recalled that Santos had no difficulty gaining entry into the house and there were "no cuts, bruises, scrapes, [or] anything on his [Santos's] face," *Id.* at 13. According to the record of police calls on February 5, 1994, regarding Santos, Boldt arrived with Santos at approximately 8:58 P.M.[9] Kisloski Affidavit, ¶ 7.

Sometime after arriving at his home, Santos had a telephone conversation with his close friend, Brad Pfalzer, who was then at Pfalzer's uncle's house in the City of Buffalo. Affidavit of Brad Pfalzer dated April 20, 1997 ("B. Pfalzer Affidavit"), Exhibit I to Plaintiff's Cross–Motion for Summary Judgment (Doc. # 23), filed April 30, 1997, ¶ 3. Pfalzer described Santos as "clearly very upset and crying hysterically." *Id.* According to Pfalzer, Santos was "shouting, 'They are coming to get me, I am going to jail.'" *Id.*, ¶ 4.[10] Pfalzer stated that Santos repeated this statement several times, that he tried to calm Santos and told him he "would be right over to be with him." *Id.* Pfalzer was immediately driven to Santos's house by his uncle. *Id.* Upon arrival, they "pounded on the doors and rang the doorbells" but got no response. *Id.* Observing that there was a light on in the downstairs but none upstairs, Pfalzer placed a telephone call to the house, but the only response was an answering machine. *Id.* Pfalzer then attempted to reach his mother, Laura Pfalzer, by calling the residence of Donald and Susan White, friends of his mother. *Id.* Unable to do so and after a further and equally fruitless attempt to raise someone at Santos's house, Pfalzer and his uncle returned to his uncle's home. *Id.*

Meanwhile, some of Plaintiff's friends, Kate and Casey Rybicki, Jessica and Richard Abbott, and Laura Pfalzer, Jessica Abbott's

sister, after bowling earlier the same evening decided to meet at the residence of Don and Sue White in the Town of Tonawanda, a community adjacent to the City of Tonawanda. Upon arriving at the Whites', at about 9:30 P.M., the Rybickis were informed by Susan White that Brad Pfalzer had called the Whites' in an attempt to reach his mother and said that Santos had threatened "to kill himself." Affidavit of Casmer Rybicki dated April 30, 1997 ("Rybicki Affidavit"), Exhibit G to Plaintiff's Cross–Motion for Partial Summary Judgment filed April 30, 1997 (Doc. # 23), ¶ 2; Deposition Testimony of Jessica Abbott ("J. Abbott Deposition"), Exhibit J to Plaintiff's Statement of Disputed Facts filed December 29, 1997 ("Doc.# 40") at 53. Rybicki and Don White immediately drove to Santos's home arriving at approximately 9:55 P.M.

Rybicki Affidavit at ¶ 2. Rybicki observed footprints in the snow leading into the house, and he and White rang the doorbell, pounded on the door and called out Santos's name with no response. *Id.*, ¶¶ 2, 4. Rybicki also observed other footprints which he later surmised were Brad Pfalzer's, whom he subsequently learned had earlier gone to the house in an effort to assist Santos. Deposition Testimony of Casmer Rybicki ("Rybicki Deposition"), Exhibits O, P, & Q to Plaintiff's Statement of Disputed Facts filed December 29, 1997 (Doc. # 40) at 22. Looking through the side door, Rybicki saw a pair of wet sneakers which he believed belonged to Santos. *Id.* at 21. Rybicki and White then located a pay phone, called the White residence and were informed that police assistance had been requested. Rybicki Affidavit, ¶ 5. Don White estimated that he and Rybicki called White's home at between 10:00 and 10:30 P.M. Deposition Testimony of Don-

---

9. The video of Santos at the City of Tonawanda police headquarters, which depicts a police officer administering the Miranda warnings to Santos and Ortiz, also shows a clock on the wall behind Santos and Ortiz. Exhibit B to Graney Declaration in Support of Summary Judgment (Doc. # 21), filed April 10, 1997. According to that clock, Santos was in the room at 9:55 P.M. No explanation has been provided for, nor have any of the parties questioned, the discrepancy between the time shown on that clock and the police records which indicate that Santos was taken home at 8:58 P.M.

10. Santos may have attempted to contact three other persons before reaching Pfalzer. See Deposition of Gisele Mroz taken April 11, 1996 ("Mroz Deposition"), Exhibit A to Graney Declaration is Support of Summary Judgment (Doc. # 21), filed April 10, 1997, at 78. There is no indication that Santos actually threatened suicide in any of these conversations including the telephone call to Pfalzer. *Id.;* B. Pfalzer Affidavit ¶¶ 1–4.

ald White ("D. White Deposition"), Exhibit N to Plaintiff's Statement of Disputed Facts, filed December 29, 1997, at 26. They returned to Santos's house and waited in Rybicki's car for the arrival of the police and Santos's step-father who was expected to return from work at about 11:15 P.M. *Id.*, ¶ 6.

Arriving at the White residence at approximately 10:00 P.M., shortly after Rybicki and White had left to go to Santos's house, the Abbotts and Laura Pfalzer were also informed by Susan White about Brad Pfalzer's call regarding Santos. Affidavit of Laura Pfalzer ("L. Pfalzer Affidavit") dated April 30, 1997, Exhibit H to Plaintiff's Cross-Motion for Partial Summary Judgment (Doc. # 23), filed April 30, 1997, ¶ 3. Laura Pfalzer then attempted to reach her son and Santos without success. Abbott Deposition at 54. About fifteen minutes after arriving at the White's and following Laura Pfalzer's attempts to reach her son and Santos, Jessica Abbott called the City of Tonawanda police. *Id.*[11] Abbott spoke with Lieutenant James Litz and told him that Brad Pfalzer had called earlier and that according to Brad's information, Santos was "frantic" and "sounded suicidal," however, Litz was initially hesitant to take action because Abbott's information was insufficiently direct. Abbott Deposition at 58; Deposition Testimony of James Litz ("Litz Deposition"), Exhibit A to Defendants' Motion for Summary Judgment (Doc. # 36), filed November 14, 1997, filed at 12. Laura Pfalzer then spoke with Litz and reiterated that Santos was "suicidal" and further stated that Santos had "access to a gun."[12] After Pfalzer demanded the police respond, the call was terminated. Pfalzer Affidavit, ¶¶ 4, 5.

As he had just come on duty, Litz, upon termination of the phone call with Laura Pfalzer, picked up his equipment and drove directly to Santos's home where he encountered Rybicki and White.[13] Litz Deposition at 14. Litz walked around the house and found nothing suspicious. *Id.* at 15. Litz explained to Rybicki and White that based on what he considered to be "fourth-hand" information and the absence of evidence of unusual activity, Litz concluded he lacked the authority to break into the house. *Id.* at 15–16. Litz specifically looked for indications that someone had recently entered the house in an effort to confirm what he had been told by Abbott and Laura Pfalzer, but found nothing. *Id.* at 16–17, 24. After completing his investigation at Santos's house, which lasted about ten minutes, Litz advised Rybicki and White they could if they desired make a forced entry, but they stated they would wait for Santos's stepfather to get home from work. *Id.* 15–16. Litz then reminded the two men to contact the police if they needed further assistance and resumed his patrol duty at about 10:50 P.M. *Id.* at 16; Rybicki Deposition at 42. Shortly thereafter, at approximately 11:21 P.M., the police received a call reporting that Santos had been found dead of a self-inflicted gun-shot wound at his home. Kisloski Affidavit, Exhibit F to Defendants' Notice of Motion (Doc. # 36), filed November 14, 1997, ¶ 11.

Based on the following discussion, Plaintiff's motion for leave to file a second amended complaint (Doc. # 7) is DENIED; Defendants' cross-motion for summary judgment and dismissal of the complaint (Doc. # 10) is GRANTED; Defendants' cross-motion to compel discovery (Doc. # 10) is DISMISSED as moot; Plaintiff's cross-motion for partial summary judgment (Doc. # 23) is DENIED; Plaintiffs motion to amend the scheduling order (Doc. # 28) is DISMISSED as moot; Plaintiffs motion to compel and extend the

---

**11.** According to the record of tape recorded telephone calls to the City of Tonawanda Police Department for the evening of February 5, 1994, Jessica Abbott's call was received at 10:35 P.M. Kisloski Affidavit, ¶ 8.

**12.** Defendants have submitted a copy of the actual tape recorded conversation. Exhibit B to Kisloski Affidavit, Exhibit F to Defendants' Motion for Summary Judgment (Doc. # 36), filed November 14, 1997. The quoted words, as used by Laura Pfalzer, are based upon the court's review of the approximately four and one-half minute tape recording.

**13.** Santos's home is about a two or three minute drive from the City of Tonawanda police headquarters. Deposition Testimony of Herbert F. Boldt, Exhibit B to Defendant's Statement of Undisputed Facts, annexed to Defendants' Notice of Motion for Summary Judgment (Doc. # 36), filed November 14, 1997, at 11.

period within which to identify experts (Doc. # 30) is DISMISSED as moot; Plaintiffs motion to amend the scheduling order (Doc. # 34) is DISMISSED as moot; and Defendants' motion for summary judgment (Doc. # 36) is GRANTED.[14]

### DISCUSSION

#### 1. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of genuine issues of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331.

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* at 255; *Rattner, supra,* at 209.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an other-

wise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* at 247–48. *See also Lipton v. The Nature Company,* 71 F.3d 464, 469 (2d Cir.1995).

While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The nonmoving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex, supra,* at 322–23. "Mere conclusory allegations or denials" in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Lipton, supra,* at 466. "Rule 56 mandates the entry of a summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra,* at 322.

To defeat a motion for summary judgment, the nonmoving party "must adduce factual material which raises a substantial question of veracity or completeness of movant's showing or presents countervailing facts." *Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir. 1972). *See also Argus, Inc. v. Eastman Kodak Co.,* 612 F.Supp. 904, 909 (S.D.N.Y.1985), *aff'd,* 801 F.2d 38 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987) (where plaintiffs did not raise any genuine issue of fact by acceptable factual

---

**14.** Defendants timely filed two motions for summary judgment, the first filed February 28, 1997, and the second filed November 14, 1997. Both motions are pending before the court and seek summary dismissal of Plaintiff's claims in their

entirety. As both motions address the merits of Plaintiff's claims although on different grounds, the court has considered them together as one motion for summary judgment.

evidence that contradicted or varied the documentary proof, summary judgment could not be defeated). According to Fed.R.Civ.P. 56(e), such factual material is to be presented in affidavits which "shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant so competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). "This requirement means that 'hearsay testimony ... that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e) ] affidavit.'" *Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986) (*quoting* 6 Moore's Federal Practice, ¶ 56.22[1], at 56–1312 to 56–1316 (2d ed.1985) (footnote omitted)).

Although the non-moving party is not required to depose her own witnesses, summary judgment must be opposed by "any of the kinds of evidentiary materials listed in Rule 56(c) ... except the mere pleadings themselves." *Celotex, supra,* at 324. Fed. R.Civ.P. 56(c) specifies depositions, answers to interrogatories, admissions on file, and affidavits as the means by which the non-moving party may oppose summary judgment by demonstrating the existence of material issues of fact.

In this case, Defendants have moved for summary judgment and to dismiss the removed Amended Complaint in its entirety, based on the expiration of relevant statutes of limitations contending Plaintiff failed to satisfy the prerequisites to an action against a municipality and its police officers under New York General Municipal Law §§ 50–e and 50–i. Defendants further contend that Defendant police officers were at all relevant times acting within the official scope of their

employment and are thus qualifiedly immune from this suit; that there was no "special relationship" between the City and Santos necessary to support a claim of negligence against the City under state law; and that there is no basis for any federal civil rights claim. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend the Complaint and in Support of the Defendants' Cross Motion for Summary Judgment and Cross Motion for an Order Dismissing Plaintiff's Complaint or, in the Alternative, Compelling Plaintiff to Respond to the Defendants' Discovery Demands ("Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend the Complaint and in Support of the Defendants' Cross Motion for Summary Judgment") (Doc. # 11), filed February 23, 1997, at 17–20. On April 30, 1997, Plaintiff moved for partial summary judgment seeking a determination that there was no probable cause to arrest Santos and to take him into police custody on February 5, 1994.

### 2. *Statute of Limitations*

■ As noted, Plaintiff has alleged state claims based on intentional torts, negligence and wrongful death and has also asserted federal civil rights violations.[15] Defendants contend that Plaintiff's state law claims are time barred and that Plaintiff cannot establish the requirements for her federal civil rights claims. Alternatively, Defendants maintain that Plaintiff has failed to show any material issue of fact going to the liability of the defendant City of Tonawanda and the unnamed police officers and, additionally, that qualified immunity applies to the actions of the police officers. Defendants therefore

---

**15.** In addition to Plaintiff's federal civil rights claims, the Amended Complaint alleged six state law claims based on negligence, intentional tort, and wrongful death. In a federal question case, the court may, in its discretion, exercise jurisdiction over the state law claims as they all "derive from a common nucleus of operative fact ... such that [a plaintiff] would ordinarily be expected to try them all in one proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Nor is it an automatic abuse of discretion for a federal court to continue to exercise pendent jurisdiction over the state claims even if the federal claims are

dismissed prior to trial. *Gibbs, supra.* Although *Gibbs* addressed the issue of pendent jurisdiction with regard to a suit that was originally filed in federal court based on federal question jurisdiction, in *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), the Supreme Court stated that where an action involving multiple claims is removed to federal court based on original federal question jurisdiction over only one of the claims, the district court should decide whether to exercise pendent jurisdiction over the pendent state-law claims based on the same criteria as required under *Gibbs. Carnegie–Mellon,* supra, at 351.

argue that Plaintiff's state claims should be dismissed and that summary judgment should be granted on the remaining federal claims thereby rendering Plaintiffs motion to file a second amended complaint naming the individual police officers who were involved in this matter moot.[16]

 It is basic that no case may be commenced if the relevant statute of limitations has passed. In a removed action based on federal question jurisdiction, the timeliness of state claims alleged in the removed case is governed by state law. *See Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 351, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d 798, 813 (2d Cir.1979). Thus, if the court after finding that the case has been properly removed, thereby affording a basis for federal subject matter jurisdiction under 28 U.S.C. § 1441(a), the court may, in its discretion, retain any removed state claims joined with the federal claim. 28 U.S.C. § 1441(c). However, the district court must apply applicable state substantive law to the resolution of the state law claims, including a statute of limitations defense. *Guaranty Trust Company v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Unless the case is remanded, after removal questions of procedure are governed by federal law. Fed.R.Civ.P. 81(c) (the Federal Rules of Civil Procedure "apply to civil actions removed to the United States District Courts from the state courts and govern procedure after removal"); *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 438, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). Here, no motion to remand was made. Accordingly, as claims under 42 U.S.C. § 1983 are alleged, the court has jurisdiction over the matter. Further, as Defendants' statute of limitations defense does not present novel questions of state law, the court elects to retain jurisdiction of the state claims. *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

### a. *The State Law Claims*

Actions grounded in tort, including a wrongful death action, against a municipality or its officers acting in their official capacity are permitted under New York General Municipal Law ("N.Y.Gen.Mun.Law") § 50. Specifically, the statute provides that

> the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based; except that wrongful death actions shall be commenced within two years after the happening of the death.

N.Y.Gen.Mun.Law § 50–i(1)(c) (McKinney 1986).[17]

As a condition precedent to suit against a municipality or its employees, plaintiffs are required to serve on the defendant a notice of claim. N.Y.Gen.Mun.Law § 50–d(2) (McKinney 1986). The notice of claim must comply with N.Y.Gen.Mun.Law § 50–e which states

> (a) In any case founded upon tort where a notice of claim is required by law *as a condition precedent* to the commencement of an action or special proceeding against a

---

**16.** Both parties have filed for amendments to the scheduling order and to compel discovery which remain pending. However, the parties have nevertheless proceeded with discovery and, based upon a review of the papers filed, it appears Plaintiff has received the requested discovery which was the subject of her motions to compel. in particular, Plaintiff requested to inspect Defendants' records of telephone calls received on February 5, 1994 concerning Santos's arrest, Plaintiff's Amended First Request for the Production and Inspection of Documents and Things, attached as Exhibit F to Plaintiff's Attorney Affidavit attached to Notice of Motion to Compel (Doc. # 30), filed July 31, 1997, at 2, ¶¶ 2, 4, the reports of any police officers involved in the matter, *Id.* at 2, ¶ 3, video tapes of Santos while

in Defendants' custody, *Id.* at 3, ¶ 7, and Defendants' policies regarding the custody of sixteen year old persons, *Id.* at 3, ¶¶ 9, 10. That material was provided by Defendants. Defendants' Reply Memorandum of Law (Doc. # 25), filed May 9, 1997, at 12; Defendants' Declaration in Opposition to Plaintiff's Motion to Compel Discovery (Doc. # 32), filed August 26, 1997. Further, no motion was filed by Plaintiff pursuant to Fed. R.Civ.P. 56(f).

**17.** Unless otherwise indicated, any references to N.Y.Gen.Mun.Law § 50 are based on the 1986 edition of McKinney's Consolidated Laws of New York.

public corporation, as defined in the general construction law,[18] or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provision of this section *within ninety days after the claim arises; except that in wrongful death actions, the ninety days shall run from the appointment of a representative of the decedent's estate.*

N.Y.Gen.Mun. Law §§ 50–e(1)(a) (emphasis added).

Further, Gen.Mun. Law § 50–i(1)(b) requires that,

it shall appear by and as an allegation in the complaint or moving papers that at least thirty days have elapsed since the service of such notice and that adjustment of payment thereof has been neglected or refused.

N.Y.Gen.Mun. Law § 50–i(1)(b).

■ Failure to timely file a notice of claim will result in a bar to the plaintiffs claim, unless leave to file a late notice of claim is granted pursuant to N.Y.Gen.Mun. Law § 50–e(5). The applicable limitations period is tolled pending determination of such motion. *Giblin v. Nassau County Medical Center,* 61 N.Y.2d 67, 471 N.Y.S.2d 563, 459 N.E.2d 856, 859 (1984). However, the time period within which to serve a late notice of claim cannot be extended beyond the applicable limitations period, *i.e.,* one year and ninety days for tort actions and two years for wrongful death actions, N.Y.Gen. Mun. Law §§ 50–e(5), 50–i(3), and the request must therefore also be filed within the statutory period. *Rattner v. Netburn,* 733 F.Supp. 162, 166 (S.D.N.Y.1989), *rev'd on other grounds,* 930 F.2d 204 (2d Cir.1991); *Cohen v. Pearl River Union Free School Dist.,* 51 N.Y.2d 256, 434 N.Y.S.2d 138, 414 N.E.2d 639, 640 (1980).

■ In the instant case, it is undisputed that the original summons and complaint were filed in New York Supreme Court, Erie County on February 2, 1996, three days short of the second anniversary of Santos's death on February 5, 1994, and well after the statutory one year and ninety day period in which to commence a tort action against a municipality and its public officers. A notice of claim was served on Defendant City of Tonawanda on February 2, 1996, nearly twenty-one months past the ninety day period required by N.Y.Gen.Mun. Law § 50–i(1)(a) and almost nine months after expiration of the one year and ninety day statute of limitations established by N.Y.Gen.Mun. Law § 50–i(1)(c). Amended Complaint, ¶ 8. Plaintiff does not address the lateness of such claim with regard to the statute of limitations, but instead argues that she is entitled to an order *nunc pro tunc* authorizing the late filing of the notice of claim with regards to the state tort claims. Plaintiff's Reply to Defendants' Cross Motions, at 4.

Permission to file a notice of claim after ninety days have elapsed since the occurrence of the events which give rise to the claim may be granted under N.Y.Gen.Mun. Law § 50–e(5). In determining whether to permit the late filing of a notice of claim, the court must consider all relevant facts and circumstances including whether the claimant was prevented from timely filing such notice based on (1) a disability, (2) death before service was possible, (3) justifiable reliance on settlement negotiations, (4) excusable error concerning the identity of the proper defendant to be served, or (5) whether the delay in serving the notice of claim prejudiced the municipal defendant. N.Y.Gen.Mun. Law § 50–e(5)(McKinney 1986). Plaintiff has not, however, established the presence of any of these factors as a basis for her late claim.

However, as the notice of claim was filed after the statute of limitations had passed with respect to all the state claims except the wrongful death claim, even if the court were to order *nunc pro tunc* the late filing of the notice of claim, such order can not negate the fact that the applicable one-year and ninety day limitations period had expired prior to

---

18. A "public corporation" is defined as "a municipal corporation, a district corporation, or a public benefit corporation," and a "municipal corporation" is further defined as "a county, city, town, village and school district." N.Y. General Construction Law §§ 66(1) and (2) (McKinney (1997)).

the filing of any complaint by Plaintiff with regard to the state tort actions and, as such, the state tort claims are time-barred. *Ratt-ner, supra* at 166 (holding that where acts giving rise to plaintiff's claims against municipality occurred more than one year and ninety days prior to request for leave to file late notice of claim pursuant to § 50–i, court was without authority to permit such filing as beyond the relevant limitations period). Therefore, as a matter of New York law, Plaintiff's belated service of the notice of claim did not satisfy the prerequisites to suit against a municipality under N.Y.Gen.Mun. Law § 50 and, as such, Plaintiffs negligence and intentional tort claims are barred.[19]

With regard to the wrongful death claim, the ninety day period in which to serve a notice of claim runs from the appointment of a representative of a decedent's estate, Gen.Mun. Law. § 50–e(1)(a), while the two year statute of limitations for commencement of a judicial action begins to run on the day after the decedent's death. *Barnes v. County of Onondaga,* 103 A.D.2d 624, 481 N.Y.S.2d 539, 544–45 (4th Dep't. 1984), *aff'd,* 65 N.Y.2d 664, 491 N.Y.S.2d 613, 481 N.E.2d 245 (1985). Although Plaintiff's wrongful death action was originally filed within the applicable two-year limitations period, it must, nevertheless, also be dismissed as untimely.

Here, Plaintiff was appointed administratrix on January 30, 1996, and the ninety day period in which to serve Defendants with a notice of claim therefore began to run that same day. N.Y.Gen.Mun. Law § 50–e(1)(a). On February 2, 1996, Plaintiff filed a summons and complaint in state court which was never served on Defendants. Instead, Plaintiff served Defendants with a notice of claim

on February 2, 1996. Accordingly, Plaintiff maintains that upon the filing of the original complaint on February 2, 1996, the action is timely as commenced within the two year wrongful death statute of limitations. Plaintiff's Attorney Affidavit in Opposition to Defendants' Cross Motions (Doc. # 18), filed March 27, 1997, ¶ 5. Defendants, however, contend that the original complaint was invalid because it failed to allege that thirty days had elapsed since service of the notice of claim, a condition to suit against a municipality and its police officers imposed by N.Y.Gen.Mun. Law § 50–i(1)(b). Graney Deposition in Support of Summary Judgment (Doc. # 21), filed April 10, 1997 at 5, ¶¶ 10–12.[20]

Compliance with the requirements of a timely served notice of claim and pleading the lapse of at least thirty days following such service as mandated by N.Y.Gen.Mun. Law §§ 50–e and 50–i are preconditions to the institution of a valid action against a municipality. *Davidson v. Bronx Municipal Hospital,* 64 N.Y.2d 59, 484 N.Y.S.2d 533, 473 N.E.2d 761 (1984). In *Davidson,* the plaintiff sued a municipal hospital based on negligence when the plaintiffs violin was allegedly stolen from the plaintiffs vehicle while it was parked in a lot owned by the defendant. Although the plaintiff served the defendant with a summons and complaint within ninety days of the alleged theft, no notice of claim was served until 115 days after the theft. Accordingly, the plaintiff's complaint did not and could not allege that a notice of claim had been served at least thirty days earlier. The Court of Appeals held that the plaintiff had not complied with the condition precedent to a lawsuit against a municipal corporation by serving defendants with only a sum-

---

19. The court also notes that Plaintiff's alleged Intentional torts are all time-barred based on the applicable one year limitations period. N.Y.Civ. Prac.L. & R. ¶ 215(3)(McKinney 1990). Defendants' statute of limitations defense, as discussed, will therefore bar Plaintiff's state claims based on common law negligence.

20. There are some discrepancies in the Graney Declaration with regard to the dates on which Plaintiff filed her original and amended complaint. Specifically, ¶ 9 of the Declaration refers to the original complaint as having been filed on

November 2, 1996, although the copy attached as Exhibit A to Plaintiff's Attorney Affidavit in Opposition to Defendants' Cross Motion, filed March 27, 1997, indicates that it was filed an February 2, 1996. Similarly, the Declaration refers to Plaintiff's amended complaint, the pleading which was subsequently removed to this court as having been filed on March 31, 1996, although according to the face of the removed amended complaint, it was filed on May 31, 1996. The sequence of these filings suggest that Declaration incorrectly identifies such dates.

**452**

mons and complaint explaining that "[t]he *mandatory* 30–day period between service of the notice of claim and the summons and complaint serves the statutory purpose of allowing municipal defendants to conduct an investigation and examine the defendant with respect to the claim ... and to determine whether the claim should be adjusted or satisfied before the parties are subjected to the expense of litigation." *Davidson,* at 762–63 (emphasis added). The court further observed, with regard to public corporations and their officers "who are subject to a great many claims, that notices of claims are processed by different administrative units, one for investigation and the other for litigation. By serving only a summons and complaint signalling a litigation, and not the statutory notice of claim followed by a summons and complaint, signalling a period for investigation, plaintiff frustrated such procedures and the legislative purpose served by the statutory scheme." *Davidson* at 763. Based on the plaintiff's failure to comply with the notice of claim pleading requirements, dismissal of the complaint was affirmed. *Id.*

Although in this case Plaintiff served the notice of claim within ninety days of being appointed administratrix of Santos's estate, the original complaint filed by Plaintiff on February 2, 1996 was defective as it did not (and in fact could not) allege that thirty days had passed since serving Defendants with the notice of claim as no such claim had then been served. Further, as Plaintiff was not appointed as the representative of Santos's estate until January 31, 1996, only five days before the statute of limitations for the wrongful death action was to expire on February 5, 1996, it was impossible for Plaintiff to timely file a complaint alleging the passage of thirty days since service of the notice of claim in accordance with N.Y.Gen.Mun. Law § 50–i(3). Moreover, § 50–i(3) specifically provides that none of the General Municipal Law's provisions, including the required thirty day waiting period between the service of the notice of claim and the filing of the complaint "shall operate to extend the [statutory limitations] period." N.Y.Gen.

Mun. Law § 50–i(3); *Rattner, supra,* at 166. Plaintiff's attempt to overcome this substantive and thus fatal deficiency by filing an amended complaint on May 31, 1996, which contains the required allegation, cannot avoid the fact that Plaintiff failed to obtain letters of appointment allowing sufficient time within which to (1) file the notice of claim, and (2) file a complaint which strictly complied with the pleading requirements of § 50–i(1)(b) within two years of February 5, 1994. It is settled law in New York that to permit Plaintiffs wrongful death claim to proceed would "frustrate" the clearly stated legislative purpose of New York's notice of claim provisions. *Davidson, supra,* at 763. As such, Plaintiff's wrongful death claim is also time-barred.[21]

■ Plaintiff nevertheless asserts that any defects in her wrongful death claim are cured by her amended complaint which contains the requisite allegation that thirty days have elapsed since serving Defendants with the notice of claim and by application of the "relation back doctrine." Plaintiff's Memorandum of Law in Support of Cross Motion for Partial Summary Judgment and in Opposition to Defendants' Amended Motion for Summary Judgment (Doc. # 24)("Plaintiff's Memorandum of Law in Support of Cross Motion for Partial Summary Judgment"), filed April 30, 1997, at 2–3. Plaintiff cites several cases in support of this contention which are addressed *infra. Id.* at 3–6.

Under N.Y.Civ.Prac.L. & R. § 3025(a)

[a] party may amend his pleading without leave of the court within twenty days after its service, or at any time before the period for responding to it expires, or within twenty days after service of a pleading responding to it.

N.Y.Civ.Prac.L. & R. § 3025(a)(McKinney 1991)(emphasis added). Additionally, where new allegations contained in an amended complaint arise out of the same set of facts or circumstances contained in the original complaint, such allegations are said to "relate back" to the date the original complaint was

---

**21.** The court notes that Plaintiff nowhere asserts that Defendants in any way frustrated her ability to obtain letters of appointment or to file suit in

compliance with the law. Nor does Plaintiff attack the constitutionality of the relevant New York statutes.

filed for purposes of determining the timeliness of such claims. N.Y.Civ.Prac.L. & R. § 203(f) (McKinney 1997) ("[a] claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading"). "Further, the 'linchpin' of the relation-back doctrine is 'notice *within the limitation period*.' " *Piccinich v. Forest City Tech Place Associates,* 234 A.D.2d 528, 651 N.Y.S.2d 203, 204–205 (2d Dep't.1996) (quoting *Virelli v. Goodson–Todman Enterprises,* 142 A.D.2d 479, 536 N.Y.S.2d 571, 574 (3rd Dep't.1989) (citing *Schiavone v. Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986))) (emphasis added). Here, it is undisputed that the original complaint was never served on Defendants. Accordingly, Defendants were not given notice of the wrongful death action within the two-year limitations period and, thus, the requirements of § 50–i(1)(b) could not be satisfied by the filing and service of the Amended Complaint.

■ Nor does the service of Plaintiff's notice of claim on the Defendant City of Tonawanda on February 2, 1996 supply the requisite notice to permit application of the relation-back doctrine. As discussed, the purpose of the notice of claim is to permit a municipality to examine a potential claim to determine whether such claim should be settled or satisfied without subjecting the parties to costly litigation. *See* Discussion, *supra,* at 452–53. The purpose of Gen.Mun. Law § 50–i is not to advise a potential municipal defendant of the initiation of an action, but rather informs of the *possibility* of an action should the payment in settlement of such claim be "neglected or refused." N.Y.Gen.Mun. Law § 50–i(1)(b); *Davidson, supra,* at 763. Thus, the notice of claim that was served on Defendants on February 2, 1996, did not constitute notice of the pending litigation in accordance with N.Y.Gen.Mun. Law § 50–i. Accordingly, Defendants were not notified within the two-year limitations period for state wrongful death actions of the initiation of an action and the Amended Complaint, filed May 31, 1996, cannot relate back

to the original filing to provide compliance with N.Y.Gen.Mun. Law § 50–i(1)(b)'s pleading requirement.

■ It is settled that the failure to comply with N.Y.Gen.Mun. Law § 50–i regarding timely service of the notice of claim and the related pleading requirement of § 50–i(1)(b) is a jurisdictional rather than a procedural defect. *Davidson, supra; Caruso v. City of Buffalo Urban Renewal Agency,* 159 A.D.2d 996, 553 N.Y.S.2d 254 (4th Dep't.1990). The cases offered by Plaintiff in support of her contention that the commencement of an action prior to the timely service of a notice of claim is merely a technical irregularity which should not bar an otherwise valid cause of action, are inapposite. Plaintiff cites *Sullivan v. Board of Education of Eastchester Union Free School District,* 154 A.D.2d 664, 546 N.Y.S.2d 665 (2d Dep't.1989) for the proposition that New York courts favor reliance on the relation-back doctrine in applying the notice of claim provisions under the General Municipal Law. Plaintiff's Memorandum of Law in Support of Cross Motion for Partial Summary Judgment (Doc. # 24), filed April 30, 1997, at 3. However, in *Sullivan* the court permitted the plaintiff to amend the notice of claim and the complaint because the original notice of claim and the original complaint were timely served within the one year and ninety day period. Similarly, in *Genesee Brewing Company, Inc. v. Village of Sodus Point,* 126 Misc.2d 827, 482 N.Y.S.2d 693 (Sup.Ct. Wayne Cty.1984), although the complaint was filed before the requisite forty day waiting period to commencement of an action against a village after service of a notice of a claim, pursuant to N.Y.Civ.Prac.L. & R. § 9802, had elapsed, more than forty days remained in the statute of limitations such that the complaint could have be timely filed and thereby also satisfy the pleading requirement. In *Kelly v. Kane,* 98 A.D.2d 861, 470 N.Y.S.2d 816 (3rd Dep't.1983), the court found that the filing of a complaint prior to the service of a notice of claim was a "mere irregularity" which should not be fatal to the action. *Kelly,* at 818. However, *Davidson, supra,* was decided by the Court of Appeals one year later and requires a different result. As discussed, *Davidson* specifically held that

pleading the service of a notice of claim in the complaint was a prerequisite to·commencing a valid action against a municipal defendant. *See* Discussion, *supra*, at 452–53. Finally, in *Fitzgibbon v. County of Nassau*, 112 A.D.2d 266, 491 N.Y.S.2d 715 (2d Dep't. 1985), the court permitted amendment of the complaint to allege the lapse of at thirty days since service of the notice of claim on the defendants. However, in *Fitzgibbon*, the plaintiff had complied with the substantive notice of claim requirements under N.Y.Gen. Mun. Law § 50–i.

Plaintiff also relies on several cases in which, based on the reported decisions, it is not possible to determine whether the notice of claim was filed in time to permit the municipal defendant thirty days to review the claim while still permitting plaintiff to file a timely complaint containing the requisite allegation in accordance with N.Y.Gen.Mun. Law § 50–i(1)(b). *See Tucker v. Long Island Railroad Company*, 128 A.D.2d 517, 512 N.Y.S.2d 450 (2d Dep't.1987); *Bravo v. City of New York*, 122 A.D.2d 761, 505 N.Y.S.2d 647 (2d Dep't.1986); *Runyan v. Board Education*, 121 A.D.2d 708, 504 N.Y.S.2d 146 (2d Dept.1986); *Snyder v. Board of Education*, 42 A.D.2d 912, 347 N.Y.S.2d 727 (2d Dept. 1973). Plaintiff's Memorandum of Law in Support of Cross Motion for Summary Judgment (Doc. # 24), filed April 30, 1997, at 3–5. Significantly, all these cases except for *Snyder* were decided after *Davidson*, and, as such, they may not be relied on as support for Plaintiffs proposition that so long as the notice of claim is timely served, the failure to allege in the complaint that thirty days have elapsed since such service is merely a procedural rather than a jurisdictional defect. Rather, it must be presumed that these courts applied the law in accordance with *Davidson*, and the undisclosed facts would reveal that in none of these cases did the courts permit late service of a notice of claim under circumstances in which, as here, it would have been impossible for the plaintiff to timely file a complaint which also complied with N.Y.Gen.Mun. Law § 50–i. Accordingly, Plaintiff's service of the notice of claim did not constitute notice to Defendants within the limitations period for a wrongful death action under New York law.

 Further, Plaintiff relies on *Melito v. Canastota Central School System*, 192 A.D.2d 754, 596 N.Y.S.2d 182 (3rd Dep't. 1993) and *McCoy v. Travelers Insurance Companies*, 152 A.D.2d 955, 543 N.Y.S.2d 840 (4th Dep't.1989) to support her contention that because her original complaint was amended *as of right*, under N.Y.Civ.Prac.L. & R. ¶ 3025(a), *see* Discussion, *supra*, at 453–54, any defects contained within the original complaint, which was filed within two years of Santos's death, were cured by the allegation in the amended complaint. Plaintiff's Memorandum of Law in Support of Cross Motion for Partial Summary Judgment (Doc. # 24), filed April 30, 1997, at 5. However, as service of the original complaint was never effected, the condition precedent as stated in N.Y.Civ.Prac.L. & R. § 3025(a) was not met and therefore the complaint was not amended as of right. It follows that the only pleading before this court is the Amended Complaint filed in New York Supreme Court on May 31, 1996 and removed to this court on June 19, 1997.[22]

In sum, to accept Plaintiff's theory that a complaint against a municipality may under New York law be amended after the statute of limitations period has run, to satisfy the notice of claim and pleading requirements under N.Y.Gen.Mun. Law § 50, would effectively render § 50–i a nullity and approve a result contrary to established New York law.

---

**22.** The court also notes that it is possible to waive defects created through service of an improperly amended pleading under N.Y.Civ. Prac.L. & R. § 3025(a) (McKinney 1974). *Chiulli v. Coyne*, 210 A.D.2d 450, 620 N.Y.S.2d 998 (2d Dep't.1994)(defendants' acceptance of and attempt to answer amended complaint constituted a waiver of any objection that could otherwise have been raised based on the filing of such complaint beyond Plaintiff's time to amend as of right); *accord, Nassau County v. Incorporated Village of Roslyn*, 182 A.D.2d 678, 582 N.Y.S.2d 276 (2d Dept.1992). However, Defendants' removal of the Amended Complaint to this court did not constitute a waiver of Plaintiff's failure to comply with New York General Municipal Law's prerequisites to suit because, as discussed, such prerequisites are a matter of substantive law and jurisdictional and therefore cannot be waived. Moreover, Defendants asserted their statute of limitations defenses to the state law claims in their answer.

■ As Defendants, after being served with the Amended Complaint, removed the case to this court, the court has also considered whether the relation-back doctrine saves Plaintiff's wrongful death claim pursuant to Fed.R.Civ.P. 15(a) and determines that it does not. Specifically, under Rule 15(c), an amended pleading relates back to the date of the original pleading provided that the defendants "(1) receive adequate notice of an action so as not to be prejudiced in maintaining a defense, and (2) knew or should have known that the action would have been brought against it earlier but for a mistake." *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1076 (2d Cir.1993) (denying claim that amended complaint which named individual defendants related back to the filing of the original complaint which named three John Does as defendants on the basis that original complaint was insufficient to notify the three previously unidentified defendants of the pending legal action). Accordingly, the Amended Complaint cannot be deemed to relate back to the filing of the original Complaint on February 2, 1996 and, as such, does not render the wrongful death action timely.[23]

#### b. *The Federal Claims*

■ State notice of claim provisions, however, are not applicable to Plaintiff's civil rights claims asserted under 42 U.S.C. § 1983 as "[w]here state courts entertain a federally created cause of action, the 'federal right cannot be defeated by the forms of local practice.'" *Felder v. Casey,* 487 U.S. 131, 138, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (*quoting Brown v. Western Ry of Alabama,* 338 U.S. 294, 296, 70 S.Ct. 105, 94 L.Ed. 100 (1949)). In *Felder, supra,* the Supreme Court specifically held that because such conditions precedent to suit in state court may result in substantially different outcomes of litigation of civil rights actions, a state's notice of claim statute was pre-empted as inconsistent with federal law as "it conflicted in both its purpose and effects with the remedial objectives of § 1983." *Felder, supra,* at 138.

■ As no federal statute of limitations for actions brought under § 1983 has been provided by Congress, the court must apply the most appropriate state statute of limitations. *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). The most appropriate statute of limitations for § 1983 actions brought in New York is New York Civil Practice Law & Rules § 214(2) which specifies a three-year limitations period to commence an action based on a liability created or imposed by statute. N.Y.Civ.Prac.L. & R. § 214(2) (McKinney 1990); *Pauk v. Board of Trustees of City University of New York,* 654 F.2d 856 (2d Cir.1981). The three year limitations period applies to both negligent and intentional forms of constitutional torts. *Owens v. Okure,* 488 U.S. 235, 238, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989).

### 3. *Plaintiff's Federal Claims*

#### a. *Plaintiffs' Fourteenth Amendment Claims*

Plaintiff has alleged that Defendants violated Santos's right to substantive due process as protected by the Fourteenth Amendment. Amended Complaint, ¶¶ 42, 45, Exhibit A to Removal Petition (Doc. # 1), ¶ 46. Plaintiff's claim is based on several allegations: (1) that the police officers illegally arrested Santos and subjected him to physical and emotional abuse; (2) that the police negligently took Santos, while he

---

**23.** Plaintiff has also moved for leave to file a second amended complaint against the defendant police officers. In their individual capacities. If granted, the claims against the officers in their individual capacities would not be subject to the prerequisite notice of claim provisions as they would not be sued as police officers. In that case, the state negligence claims, which would be subject to a three year statute of limitations, N.Y.Gen.Prac.L. & R. § 214(5) (McKinney 1988). The intentional tort claims, which are subject to a one year limitations period, N.Y.Civ.Prac.L. & R. § 215(3)(McKinney 1988) are time-barred as no complaint was filed within one year of Santos's death. However, nowhere in Plaintiff's Proposed Second Amended Complaint is there any allegation that Defendants were acting outside the scope of their employment and only as private individuals. Thus, the Proposed Second Amended Complaint is insufficient on its face to state a claim against the police officers as private individuals and, based on the Discussion, *infra,* 466–67, the court will deny Plaintiff's motion to file a second amended complaint.

was in a state of emotional distress, to his home and directed he to stay there, knowing or believing he would be alone, until his parents came home; and (3) that the police failed to promptly respond and break into Santos's home after being informed that Santos had threatened suicide thereby rendering the police responsible for Santos's death. Amended Complaint at ¶¶ 20–29.

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court held that "the State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney* at 197. The Court rejected the argument that knowledge of potential danger to a person with whom the state may, under state law, have a special relationship, creates an affirmative duty to protect the individual under the Due Process Clause. *DeShaney* at 198. Rather, the Court reaffirmed that such an obligation to protect arises only where the state has deprived a person of his liberty and thus his ability to protect himself as where the person has been taken into custody. *Id.* at 199–200. An allegation that police officers failed to act on reports of past violence is insufficient, however, a Fourteenth Amendment violation may arise if the officers "had assisted in creating or in increasing the danger to the victim." *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993) (allegation that officers conspired with "skinheads" to permit the latter to beat up flag burners with relative impunity stated violation of the Fourteenth Amendment). Persons in state custody, including pretrial detainees, have a right to "some level of care and protection, including protection against suicide." *Hanrahan v. City of Norwich*, 959 F.Supp. 118, 122 (D.Conn.1997) (citing *Hare v. City of Corinth*, 74 F.3d 633, 647 n. 3 (5th Cir.1996)), *aff'd*, 133 F.3d 907 (2d Cir.1997).

To establish a federal due process violation based upon the failure of an official with custody of a pretrial detainee to protect the detainee from suicide, the custodian must have acted in reckless disregard of a substantial risk to the detainee's safety because of a deliberate indifference to the detainee's needs. *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(test is whether a prison official subjectively "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Hanrahan, supra*, at 122 (citing *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)). Negligent inaction will not suffice to establish a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 332–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In *Hanrahan*, the court noted that while the Second Circuit has not specifically ruled on the issue, other circuits have held, as to failure to protect claims involving pretrial detainees, the deliberate indifference standard to be a subjective one, *id.* at 122 n. 6, in accordance with *Farmer, supra* (subjective deliberate indifference required to establish a due process claim based on inadequate medical care for a pretrial detainee). *Farmer, supra*, at 847. The Supreme Court in *Farmer* stated the test as follows: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, supra*, at 837. Based on its review of the relevant caselaw, the court stated that the subjective deliberate indifference standard "precludes individual liability unless the custodial official actually knew of a substantial risk that the detainee might commit suicide and violated the detainee's rights by responding with deliberate indifference." *Hanrahan*, at 122 n. 6. The court in *Hanrahan* further found that "no case in which a claim [for failure to prevent the suicide of a pretrial detainee] was tried to jury in the absence of evidence that the official knew the person for whom he was responsible had threatened to commit suicide, displayed suicidal tendencies or exhibited other symptoms of emotional disturbance showing a vulnerability to suicide." *Id.* at 122, n. 7 (citing cases).

Thus, unless Plaintiff can demonstrate there exists a material issue of fact going the questions of (a) whether Santos remained in the Defendants' custody after being taken to his home, and (b) whether the Defendants

had actual knowledge of a substantial risk that Santos might commit suicide and understood such risk to be the result of their failure to act, Defendants are entitled to summary judgment on Plaintiff's due process claims. Based on the court's review of the evidence presented by the parties, the court finds that Plaintiff has failed to show that either issue requires determination by a jury.

■ Whether a person is in custody turns on whether the facts show that a reasonable person would have believed, that under the circumstances presented to him including the presence of police officers or some other show of authority, he was not free to leave. *California v. Hodari D.,* 499 U.S. 621, 627–28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) Here, Santos after being held at the police station for less than one hour following his arrest was told that the person who initiated the complaint leading to his arrest would not file charges and that as a result both he and Ortiz were being released.[24] After completing some paper work, Lieutenant Boldt offered Santos a ride home in a police car. While there is no specific indication that Santos voluntarily accepted the offer, it is undisputed that Boldt drove Santos to his home and that Santos entered the house while Boldt was present. Boldt testified that he told Santos he should stay at home until his stepfather returned from work and to inform him about to incident involving the starter pistol. While Boldt's statement to Santos could be construed as a direction limiting Santos's freedom of movement, there is no indication that Boldt told Santos the instruction would be enforced. Moreover, neither Boldt nor any other officer told Santos he was required to remain at home or face additional charges. Further, according to Brad Pfalzer, Santos called him in a highly agitated manner asserting he was going to jail. Their conversation, as related by Pfalzer, does not suggest Santos felt constrained to remain in the home under penalty of official sanctions. The question becomes whether a reasonable sixteen year old in the circumstances could reasonably believe he was under official custody while in his home until his parents returned. On the evidence presented, the court finds no reasonable person in the circumstances presented to Santos would reasonably believe he remained in official custody.

■ The conclusion must be the same on the other required element of whether the police had actual knowledge that Santos posed a risk of suicide and therefore had the subjective intent to act or refuse to act with deliberate indifference to that risk. First, Santos's mother, herself stated that prior to February 5, 1994, Santos was well behaved youngster with no history of emotional or mental problems. Mroz Affidavit, at 7. Thus, there was no reason based on Santos's pre-arrest history from which a suicidal tendency could be gleaned. In any event, the record does not show the police had any information about Santos's mental health history. Second, until the phone call from Jessica Abbott and Laura Pfalzer was received by Lieutenant Litz, the record is devoid of any indication that at any time during his encounter with the police Santos exhibited any suicidal behavior or made threats to kill himself or when the police officers had knowledge.

■ Plaintiff relies heavily on the Ortiz Statement, Exhibit F to Doc. # 18, to establish that Santos while in police custody several times stated that he would kill himself because of the trouble he had gotten into. Ortiz Statement at 19, 38, 42–43. However, this statement is not sworn to nor does it provide any indication that it is declaration made under penalties of perjury sufficient to be considered as evidence in opposition to a motion for summary judgment. Fed. R.Civ.P. 56(c), (e). Absent any indicia of being such, it cannot serve to defeat Defendants' motion. *United States v. All Right,*

---

**24.** Contrary to Defendants' assertion that Santos was not arrested when he was taken to police headquarters, the court finds that he was. Santos was transported to the police headquarters in the rear seat of the police car in handcuffs and upon arrival at police headquarters he was read his Miranda rights. Based on these facts, there can also be little doubt that but for the refusal of the woman who reported the gun waiving incident, Santos would have been formerly charged with an offense.

*Title and Interest in Real Property and Appurtenances,* 77 F.3d 648, 657 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996)(unsworn statement in claimant's letter properly disregarded as opposition to summary judgment); *Beyah v. Coughlin,* 789 F.2d 986, 989–90 (2d Cir.1986) (summary judgment may not be granted based on either statements contained in attorney affidavit of which attorney did not have personal knowledge, or letters attached to affidavit which were not sworn to as required under Rule 56(e), or on defendants' sworn answers to plaintiffs interrogatories and requests for admission which were not based on personal knowledge); *Lakeview Outlets, Inc. v. Uram,* 1996 WL 571520 *1 (N.D.N.Y.1996)(court declined to accept unsworn statement submitted in opposition to summary judgment motion). Nor can Ortiz's statement qualify under 28 U.S.C. § 1746 which permits the courts to accept unsworn statements if the person giving the statement subscribes to it in writing under penalty of perjury. An examination of the statement reveals that although Ortiz gave his statement before a stenographer who was also a notary public there is no indication that an oath was administered to Ortiz, that the statement was given under penalties of perjury, or that it was even signed by Ortiz. Accordingly, the statement must be disregarded for purposes of Defendants' and Plaintiff's motions for summary judgment. *See United States v. All Right, Title and Interest in Real Property and Appurtenances, supra; Beyah v. Coughlin, supra; Lakeview Outlets, Inc. v. Uram, supra.*

Even if the court were to consider Ortiz's statement, the result would be the same. For example, Ortiz related that while Santos and he were at the police station "[h]e [Santos] kept crying after the cop left the room. He kept saying I'm going to get into trouble and I told him, I will talk to your mother and after that, I don't know, he never told me he was going to do something like that." Ortiz Statement at 14. However, Ortiz further describes their discussion while in the room as follows: "Well, I was just sitting with, it was just me and him. Nobody was in the room and he goes [says] like, I don't want to go home and I said don't worry about it, you're not going to get in trouble and he said like, I don't want to go to jail, my mom's going to get really mad at me. He told me he was going to kill himself." Ortiz Statement at 19. Although Ortiz recalled that Santos's suicide threat was made after a police officer told Santos he was going to jail, *Id.* at 42, it is evident that this statement, based on the sequence of events as related by Ortiz, was made while the two were in the room at police headquarters where they were given their Miranda rights. *Id.* at 8, 10. This fact is supported by Ortiz's recall of their conversation in the police car on the way to police headquarters in which Ortiz fails to mention the subject of suicide. Ortiz Statement at 8. However, after the officer gave the warning, according to Ortiz, the officer "left the room and me and Phil [Santos] was just in there talking. Q. [Plaintiff's attorney] By yourselves? A. Yeah." *Id.* at 10. Thus, there is no indication that Santos's threat, even if it had been made, was overheard or could have been overheard by the police while Santos was in custody. Significantly, Ortiz was never asked that question directly during his recorded interview by Plaintiffs attorney.

■ Plaintiff also contends that as Santos was crying continuously after his arrest, this fact alerted the police to his vulnerable emotional state and the need to exercise special care toward Santos to avoid possible suicide. Plaintiff's Reply to Defendants' Cross Motions (Doc. # 17), filed March 27, 1997, at 6–7. According to Ortiz, Santos's severe emotional upset began after the officer who stopped them "slammed his face" on the police car hood, Ortiz Statement at 23, and continued throughout the balance of their custody. *Id.* at 18 ([Santos] "wouldn't stop crying"), 21 ("shaking, crying, [Santos] couldn't stop crying."). Although, unlike Santos's alleged suicidal threats, Ortiz stated that Santos's emotional state was observed by the police, such observation would not cause a reasonable juror to find that Santos exhibited an "emotional disturbance showing a vulnerability to suicide" so as to cast the police with actual knowledge of the existence of a threat of suicide. *Hanrahan, supra,* at 122. Even if it occurred, the fact of continu-

ous crying by a sixteen year old while in police custody would not put a reasonable police officer on notice that a substantial risk of suicide was presented. *See Hanrahan, supra,* at 122 (no signs or symptoms of emotional disturbance that would put defendant deputy police chief who interviewed decedent on notice of risk of suicide); *Gordon v. City of New York,* 70 N.Y.2d 839, 523 N.Y.S.2d 445, 517 N.E.2d 1331, 1332 (1987) (arrestee's boisterous, irrational and delusional behavior insufficient to put jail guard on notice of possible attempt to scale bars of cell and dive head first into toilet bowl causing injuries). *Cf. Liscio v. Warren,* 901 F.2d 274, 276–77 (2d Cir.1990) (in suit for recovery for irreversible kidney damage resulting from physician's failure to treat plaintiff inmate for alcohol withdrawal, court found that, based on physical symptoms exhibited by pre-trial detainee, physician was "on notice" detainee might also be suffering form alcohol withdrawal rather than solely from heroin withdrawal as indicated by detainee); *Dinnerstein v. United States,* 486 F.2d 34, 36 (2d Cir.1973) (Federal Tort Claims Act decedent's past history of mental depression and suicidal tendencies gave notice of need for supervision).

The case of *Hare v. City of Corinth, supra,* was remanded to the district court by the Fifth Circuit Court of Appeals with instructions that the correct legal standard to be applied in determining whether defendant jail officials had violated a pre-trial detainee's due process rights when they failed to prevent the detainee from committing suicide while she was in custody was whether the officials "had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Hare, supra,* at 650. In *Hare,* the plaintiffs argued that although defendants admitted having knowledge of such facts including that the decedent was depressed about being in jail, sat in a "fetal-type" position, was crying, and stat-

ed her intention to kill herself in the presence of the police captain, defendants nevertheless placed the decedent in a jail cell containing a blanket with which, after fashioning it into a noose, the decedent hung herself. *Hare* at 637–38. On remand, the district court applied the subjective test as directed by the court of appeals and again found a material issue of fact existed to warrant denial of defendants' motion for summary judgment. *Hare v. City of Corinth,* 949 F.Supp. 456 (N.D.Miss.1996).[25] By comparison, in the instant case, the evidence fails to show Thiebolt, Boldt or Reiss had overheard any suicide threat by Santos even if they were uttered as Ortiz claims.

Plaintiff has not provided any evidence to support an inference that based on the facts of Santos's encounter with the police and his brief subsequent custody, the degree of crying ascribed to Santos by Ortiz denoted any risk of potential suicide. In sum, the evidence presented shows no basis on which a reasonable juror could find the police knew Santos presented a risk of suicide and that their failure to keep him from being alone in his home made this risk a likelihood. Additionally, Plaintiff does not argue that Santos's possession of the starter pistol should have alerted the officers to the risk that Santos would have access to dangerous weapons.

█ Further, and assuming *arguendo,* that such notice has been shown by Plaintiff, summary judgment must nevertheless be granted to Defendants because Plaintiff has not established the existence of a material issue of fact as to the issue of whether once the Defendants were provided with notice of Santos's possible suicide, there was any causal connection between Defendants' subsequent response and Santos's death. Based on the record presented, it is reasonably established that following his release, Santos arrived at his home at approximately 9:00

**25.** However, that decision was later reversed on the basis that even if under the circumstances defendants could be found to have had actual knowledge of the substantial risk of serious harm, the defendants were nevertheless entitled to qualified immunity on the basis that their actions were objectively reasonable in placing decedent in the cell that was closest to a monitor,

instructing the officers to watch decedent closely, removing decedent's belt and shoes because they had laces, and that the officer's decision not to remove the blanket was reasonable where the officer believed the decedent, who weighed only one hundred pounds, did not possess the strength to tear it. *Hare v. City of Corinth,* 135 F.3d 320, 323 (5th Cir.1998).

p.m. This fact is confirmed by the testimony of Casey Rybicki, Don White, Jessica Abbott and Laura Pfalzer who all recalled that they arrived at the Whites' home after 9:30 p.m. and that Brad Pfalzer had already telephoned with his ominous message about Santos. This conclusion is also consistent with Rybicki and White's recollection that they immediately left the Whites' home to investigate the situation at Santos's house and later called back to the Whites' to learn that Jessica and Laura had by then spoken to the City of Tonawanda police demanding the police investigate. That call, as noted, was received by the police at about 10:35 p.m. Plaintiff disputes the time as reflected in the record of the tape recorded police call by pointing to Laura Pfalzer's deposition testimony in which she stated the call was made at about 10:15 p.m. Plaintiff's Statement of Disputed Facts (Doc. # 40), filed December 29, 1997, ¶ 11. The court finds such difference to be immaterial for the reason that even Rybicki and White believed, upon their arrival between 9:30 p.m. and 10:00 p.m., Santos to then be in the house as they observed Santos's wet sneakers inside the side door, and footprints leading to the side door of the house, but none coming out, a fact which they claimed to have pointed out to Lieutenant Litz after his arrival. Rybicki Deposition, Exhibit O·to Plaintiff's Statement of Disputed Facts (Doc. # 40), filed December 29, 1997. Moreover, Plaintiff provides no reason to question the accuracy of the recorded telephone calls regarding Santos received by Defendants on February 5, 1994.

The record is also consistent that none of the persons who responded to Santos's house including Brad Pfalzer, who undisputedly arrived before Rybicki and White that night, heard any noise from within the house nor any unusual activity either inside or outside while they were at the house. Additionally, it is undisputed that Santos was discovered dead after his stepfather's arrival sometime after 11:15 p.m. The medical examiner's report, containing the results of the autopsy conducted on Santos, see Exhibit D to Graney Deposition in Support of Summary Judgment (Doc. # 21), filed April 10, 1997, gives no estimate of the time of death. Nor has Plaintiff attempted to establish such fact by

evidence, an issue on which Plaintiff has the burden of proof. *Celotex, supra,* at 322. Unless it can be shown that Santos killed himself after the police were called, their deliberate indifference, even if proven, would have had ·no causative effect. Accordingly, as Plaintiff has the burden to establish that the deliberate indifference of the police caused or could have prevented the suicide once they had notice of the risk, there is no material issue of fact for the jury on the issue of such causality. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (murder committed by parolee five months after being released from prison was too remotely connected to parole officer's decision to release to hold state parole board responsible based on a due process violation as · the release of a parolee posed no "special danger" to a murder victim as compared to the general public); *DeShaney v. Winnebago,* 812 F.2d 298, 302 (7th Cir.1987), *aff'd,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (causal connection between defendants' conduct and claimed injuries too attenuated to establish constitutional violation); *cf.* *Hayes v. New York City Dep't. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (plaintiff's identification to prison officials of other inmates who had allegedly threatened plaintiff with physical harm established material issue of causality as to whether prison officials had sufficient knowledge of risk to plaintiffs safety such that failure to take protective measures to prevent physical attacks constituted deliberate indifference in violation of plaintiffs civil rights); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (inmate plaintiff's failure to allege any causal connection between injuries which resulted from assault by other inmates and actions on the part of superintendent of correctional facility required dismissal of complaint as against superintendent).

Moreover, based upon the record, there is no indication that the police had reason to believe that Santos had access to a firearm until Laura Pfalzer told this to Litz during their phone conversation. It also is significant that the shot which Santos fired caused his death instantly. Exhibit D to Graney

Deposition in Support of Summary Judgment (Doc. #21), filed April 10, 1997, at 1–2. In short, because Plaintiff has failed to show that Santos may have been alive when the police were first alerted to the threat of suicide, Plaintiff cannot show that the failure of the police, particularly Lieutenant Litz, to respond more rapidly or to break into the premises immediately upon arrival could have altered the fatal outcome of the events at issue.[26]

Therefore, Plaintiff has failed to establish the existence of material issues of fact going to the issue of whether Defendants acted or failed to act with deliberate indifference to Santos's safety as a possible pretrial detainee and that such failure were a substantial factor in causing Santos's death or any emotional distress preceding the suicide. As such, Defendants must be granted summary judgment on Plaintiff's Fourteenth Amendment claims.

Plaintiff's claim that Santos's death resulted from a policy or custom of Defendant City must also be dismissed. To be actionable under § 1983, a claim against a city must be based upon the municipality's official policy or custom which results in the alleged violation. *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under § 1983, there is not derivative liability to an employer. *Monell* at 691. The city has admitted that it has no policy for the treatment and handling of sixteen year old suspects while in custody. Letter from Charles E. Graney to the court, dated September 12, 1997, Exhibit K to Attorney Affidavit of John B. Surgalla, Esq. (Doc. #41), filed December 29, 1997.[27] However, Plaintiff has presented no evidence from which to infer that the City of Tonawanda has a custom and policy of being deliberatively indifferent to the well-being of persons, including sixteen year olds, in the custody of its police. Accordingly, summary

judgment must also be granted as to this claim.

Finally, as the court has found no liability against the individual unnamed police officer defendants, it follows that Plaintiff's claim against the Defendant City of Tonawanda based on Plaintiff's allegation that the city failed to properly train its police officers in the proper treatment of teenage detainees in its custody must similarly be dismissed. A § 1983 action based on a failure to train allegation must establish that such failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A municipal defendant may be liable under § 1983 only if "a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...." *Id.* at 389. Plaintiff has produced no evidence to show such deliberate indifference on the part of the Defendant City nor evidence of any failure to train. Additionally, where the individual agents of the municipality have been found not to have violated the plaintiffs rights, no liability under § 1983 can attach to the municipality based on a claim of failure to train. *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123 (2d Cir.1997) ("a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised"). Here, as discussed, the individual police officers, who were shown to have had any contact with Santos, did not violate Santos's Fourteenth Amendment rights. As such, Defendant City of Tonawanda is entitled to summary judgment on Plaintiff's claims for violations of Santos's rights under the Four-

---

**26.** Although Plaintiff alleges the police spoke harshly and in an insulting manner to Santos, Amended Complaint, ¶¶ 23, 24, unless Santos's emotional status indicated he was a suicide risk there is also no material issue of fact as to whether the police could be held to have assisted in creating or in increasing the danger to the victim. *Dwares, supra,* at 99.

**27.** Under New York Criminal Procedure Law § 120.90(7) (McKinney 1997), a custodian of a person fifteen years or younger must not release such person unless a parent or guardian is first contacted.

teenth Amendment based on an alleged policy and practice and failure to train.[28]

### b. *Plaintiff's Fourth Amendment Claims*

 Plaintiff alleges that Defendants violated Santos's rights under the Fourth Amendment when Officer Thiebolt arrested Santos without probable cause and used excessive force in effecting the arrest. Amended Complaint, ¶ 14. A claim under § 1983 for violation of the Fourth Amendment prohibition against seizure without warrants based on probable cause requires a plaintiff establish that the arresting officer lacks an objectively reasonable belief that probable cause for the warrantless arrest exists at the time the officer makes the arrest. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118–19 (2d Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause"). Probable cause requires a flexible common sense evaluation of all the facts known to the officer at the time of the arrest. *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Marshall v. Sullivan*, 105 F.3d 47, 53 (2d Cir.1996). Probable cause is the existence of reasonably trustworthy information sufficient to cause a person of reasonable prudence to believe that believe that a crime had been committed and that the person to be arrested committed it. *Gates, supra*, at 231; *Singer, supra*; *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991), *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992).

 Moreover, the existence of probable cause is not defeated even where it is based upon mistaken information so long as the arresting officer was reasonable in relying upon the information. *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.1994). An officer may rely on hearsay information in his determination of probable cause if there a reasonable basis to credit the information. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (articulating determination of whether probable cause existed to arrest must be based on the totality of the circumstances which includes hearsay). In the case at bar, Defendants' evidence established that Lieutenant Thiebolt responded to a radio alert based on a phone call received from Kasprzak who was relying a complaint made to him by a woman who came to his home in a frightened state caused by her encounter with a young male whom she said was waving a gun near her as she was walking down a neighborhood street. After calling in the complaint, Kasprzak personally went to the area described by the woman and observed two young males who appeared to fit the description given by the woman. Theibolt arrived on the scene and Kasprzak gave this information to Theibolt who after determining that one of the youths, Santos, generally matched the woman's description, stopped Santos and Ortiz, searched Santos and retrieved the starter pistol. Thiebolt handcuffed both youths, and transported them to police headquarters for further investigation. Preliminarily, as discussed, *see* Discussion, *supra*, at 457, n. 24, the court rejects Defendants' argument that Santos and Ortiz were not arrested when they were taken to the police station.

On the other hand, it is equally the case that the arrest was based on probable cause. When Thiebolt arrived at the scene he already knew that Kasprzak had reported the gun-waving incident and that Kasprzak's report was based on the statements of the woman whom had come to his house for assistance. As Kasprzak's report indicated that the woman appeared greatly frightened by the conduct of the person she had described to Kasprzak, it was reasonable for Thiebolt to believe that her complaint was not imaginary. Further, the fact the Kasprzak himself had voluntarily personally assisted in the investigation by locating Santos and Ortiz in the same area as the woman had herself described to Kasprzak, reinforced Thiebolt's belief that he was dealing with a

---

**28.** Although Defendants also assert qualified immunity as an alternative basis for summary dismissal of Plaintiff's federal claims, Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend the Complaint and in Support of the Defendants' Cross Motion for Summary Judgment (Doc. # 11), filed February 28, 1997, at 17–20, as the court is dismissing Plaintiff's federal claims on the merits, Defendants' alternative and unpled qualified immunity argument will not be addressed.

credible source. Thiebolt could reasonably conclude that a private citizen would not be motivated to expose himself to risk unless he sincerely believed the woman's complaint. Finally, the visual observations of both Kasprzak and Thiebolt that Santos generally matched the description of the male person who brandished the gun and was present in the general area as related by Kasprzak served to reasonably corroborate the hearsay report given to the police by Kasprzak thereby further crediting both Kasprzak and the woman as sources of trustworthy information. After discovering the weapon, Thiebolt therefore had probable cause to arrest.

■ Further, Thiebolt did not violate Santos's rights when he stopped him to investigate the complaint. Where a police officer has a reasonable suspicion based on articulable facts that criminality may be afoot, he may stop and briefly question a suspect to allay his suspicions. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The officer may also conduct a limited pat down frisk if he has reason to believe he may be in danger. *Terry* at 26. Here, the undisputed evidence shows that Thiebolt had reasonable suspicion to stop Santos for the crime of menacing while using a pistol.[29] Plaintiff apparently concedes as much. *See* Plaintiff's Reply to Defendants' Cross Motions (Doc. # 17), filed March 27, 1997, at 6. The court agrees. Based on the undisputed evidence Thiebolt had reasonable suspicion to believe Santos had been engaged in criminal activity either unlawful possession of firearm, menacing or both. Upon stopping Santos, Santos admitted having the pistol and Thiebolt immediately seized it from him thus further corroborating Kasprzak's report. Plaintiff argues, however, that at this point Thiebolt lacked probable cause to arrest Santos on the menacing charge because he did not confirm that the woman was placed in reasonable fear of physical injury or death as a result of Santos's display of the firearm in her presence. *Id.,* at 6–7. Plaintiff further argues that as the woman told investigators

the day after the incident that the gun was never pointed at her that there was no probable cause for Thiebolt to have believed that element of the offense had occurred. *Id.* at 4. Additionally, Plaintiff further contends there was no probable cause to believe a real weapon was involved because Santos told Thiebolt before he was taken into custody that the pistol was a not a real gun. Plaintiff's Memorandum of Law in Support of Cross Motion for Partial Summary Judgment (Doc. # 24), filed April 30, 1997, at 8.

■ There are several answers to Plaintiff's arguments. First, it is established law that whether probable cause exists is determined not on the basis of what the facts were after the arrest but upon what they reasonably appeared to be to the arresting officer prior to the arrest. *Ricciuti v. N.Y.C. Transit Authority, supra,* at 128 (in evaluating whether an officer has probable cause to arrest a court must consider the facts available to the officer at the time of the arrest) (citing *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996)). Second, although Thiebolt did not have the opportunity to interview the woman before taking Santos into custody, he was aware based on Kasprzak's report that the woman appeared extremely frightened as result of the encounter with the person who had brandished the gun. From that fact and Thiebolt's corroboration of the woman's statement that a pistol was involved, Thiebolt could reasonably conclude that the woman was placed in reasonable fear of physical injury, an essential element of the menacing offense. Finally, it was irrelevant to Thiebolt's belief that a crime had been committed whether the pistol was asserted to be a real one or not as under the statute the menacing offense may arise based on "what appears to be a pistol." N.Y.Penal Law § 120.14(1) (McKinney 1997).

As noted, the fact that an arresting officer may entertain a mistaken belief as to existence of facts upon which his determination of probable cause was based does not vitiate

---

**29.** Under New York Penal Law § 120.14, "[a] person is guilty of menacing in the second degree when: (1) He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or

death by displaying a deadly weapon, dangerous instrument *or what appears to be a pistol,* revolver, rifle, shotgun, machine gun or other firearm." N.Y.Penal Law § 120.14(1) (McKinney 1997) (emphasis added).

the determination if the officer reasonably relied on the information. *See Bernard v. United States, supra.* For these reasons, Thiebolt's reliance on Kasprzak's assessment of the woman's high degree of apprehensiveness immediately following her encounter with the person brandishing the pistol was reasonable. Thiebolt's reliance was ·therefore not based on a mistaken belief as to the facts but even if it were, his reliance was reasonably based. It was therefore reasonable for Thiebolt to have believed the woman had suffered a reasonable fear of physical injury. When Thiebolt took Santos into custody, he had probable cause to arrest him for menacing.

Plaintiff also claims that Thiebolt violated Santos's Fourth Amendment rights by using excessive force during the stop. Because no police officer, including Thiebolt, admitted to using any such force nor observed any indicia of physical force upon Santos, and as the medical examiner's report fails to indicate that there were any signs of force being applied to Santos such as cuts or bruises, Plaintiff relies upon Ortiz's statement to defeat summary judgment on this issue. However, as discussed, *see* Discussion, *supra,* at 457–58, the Ortiz Statement is inadmissible on the instant motions. Even if the Ortiz Statement ·were admissible, Defendants' would be entitled to summary judgment on this claim. ·

■■■ To establish a claim for excessive force under the Fourth Amendment, "a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth· Amendment standards." *Finnegan v. Fountain,* 915 F.2d 817, 823 (2d Cir.1990) (quoting *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "The reasonableness of the force used is 'judged from the perspective of a reasonable officer on the scene' and takes into account factors such as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Finnegan, supra,*

at 822 (quoting *Graham v. Connor, supra,* at 396) (internal citations omitted).

■■■ According to Ortiz, after ordering Santos to put his head of the hood of the police car, Thiebolt "slammed" Santos's head into the hood when Santos turned to address Thiebolt about the pistol. Ortiz Statement at 4,5, 7. At that point, based on the reliable information which Thiebolt had received, it was objectively reasonable for Thiebolt to have believed that he was confronting an armed person who had just threatened another individual by brandishing a weapon. While the gun seized from Santos was subsequently determined to be a starter pistol which could not fire bullets, that fact was not known to Thiebolt when he made the stop. As discussed, Thiebolt had reasonable suspicion to stop Santos and Thiebolt was not obligated to credit Santos's assertion that the weapon was not a real one until he had frisked Santos and eliminated the potential use of the weapon against him. Thiebolt's direction to Santos to keep his head on the hood of the police car until he had secured the pistol was not objectively unreasonable in the circumstances. Therefore, even if Thiebolt did push Santos's head onto the hood in a forceful manner when his direction was not followed by Santos, such action would not be objectively unreasonable as even Ortiz's statement confirms that Santos had not completely complied with Thiebolt's reasonable direction. It would be objectively reasonable for an officer confronted by such a failure to comply with his direction to physically enforce compliance, particularly where the investigation involved a firearm.

Moreover, in his statement Ortiz does say that any bruising or cutting of Santos's face resulted, a fact confirmed by the medical examiner's report conducted later. Further, Defendants submitted a copy of the video tape of the time period when Santos and Ortiz were being held in a small room inside the police station, which occurred within minutes of the stop. *See* Exhibit B to Defendants' Declaration in Opposition to Plaintiff's· Motion to Amend Complaint and in Support of the Defendants' Amended Cross–Motion for Summary Judgment and Defendants' Cross–Motion to Dismiss or Compel Re-

sponses to Discovery Demands (Doc. # 10), filed April 10, 1997. A review of the video fails to reveal any indication of facial wounds, bruising or any discoloration on any of the persons depicted in the video, and Plaintiff does not dispute that Santos is in the video. Moreover, none of the individuals in the video appear to be crying or displaying any emotional behavior. Based on these facts, there is no material issue of fact on the question of whether Thiebolt used any force whatsoever on Santos, nor is there any question as to whether such force which may have been used, as asserted by Plaintiff, was objectively unreasonable. Defendants are therefore entitled to summary judgment on Plaintiff's excessive force claim and Plaintiff's motion for partial summary judgment on the issue of arrest without probable cause must be denied.

### c. *Plaintiff's Other Constitutional Claims*

Plaintiff also alleges that Defendants denied Santos other constitutional rights by infringing on Santos's rights to freedom of speech in violation of the First Amendment, to an attorney in violation of the Sixth Amendment, and to equal protection under the Fourteenth Amendment, and by subjecting Santos to verbal and emotional abuse. Amended Complaint, ¶¶ 2, 42, 46.

As the Amended Complaint does not state how the police interfered with Santos's rights under the First Amendment, the court construes such claim as alleging the police interfered with Santos's right to free speech by slamming Santos's face into the hood of the patrol car when Santos attempted to apologize for frightening the woman who complained to Kasprzak with the fake gun. However, the only evidence submitted by Plaintiff in support of this claim is the unsworn statement of Ortiz which, as discussed, is inadmissible to demonstrate the existence of a material issue of genuine fact as to this claim. *See* Discussion, *supra*, at 457–58. Plaintiff has therefore failed to meet her burden on this claim and summary judgment in favor of Defendants must be granted.

▓▓ Plaintiff also claims, but does not allege how, Santos's rights under the Sixth Amendment were violated. Amended Complaint, ¶¶ 2, 42, 46. The Sixth Amendment guarantees an accused the right to a speedy trial, to be informed of the nature of the accusation, to confront witnesses, to have the assistance of counsel, and compulsory process. United States Constitution, Sixth Amendment. The Sixth Amendment, however, does not attach until an accused is formally charged with a crime. *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Neighbour v. Covert*, 68 F.3d 1508, 1511 (2d Cir.1995), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996). It is undisputed that although taken into custody, Santos was not charged with any crime and, accordingly, no rights secured under the Sixth Amendment could have been violated by Defendants. Summary Judgment in favor of Defendants must also be granted on this claim.

▓▓ Plaintiff further alleges that Defendants verbally abused Santos and repeatedly subjected him to emotional and mental abuse from the time Santos was arrested until Boldt drove Santos home. Amended Complaint, ¶¶ 15, 18, 27, 28. Verbal threats, abuse and even vile language generally do not arise to the level of a constitutional violation under 42 U.S.C. § 1983. *Beal v. City of New York*, 1994 WL 163954, *6 (S.D.N.Y.1994) (granting defendant police officer's motion for summary judgment dismissing § 1983 claim based in part on alleged use of foul language and threats of bodily harm to plaintiff arrestee), *aff'd* 89 F.3d 826 (2d Cir.1995); *Keyes v. City of Albany*, 594 F.Supp. 1147, 1155 (E.D.N.Y.1984) (holding that "stream of verbal abuse, including racial epithets" directed at plaintiff and his young children in course of arresting another individual did not amount to a constitutional violation). Only in rare circumstances in which the threats involved were "'inspired by malice' rather than merely careless or unwise zeal so that [they] amounted to an abuse of official power that shocks the conscience'" have courts recognized exceptions to this rule. *Beal, supra* (quoting *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir.), *cert. denied*, 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983)).

However, in response to Defendants' motion for summary judgment, Plaintiff points only to the unsworn statement of Ortiz as establishing that Defendants subjected Santos to verbal and emotional abuse. Plaintiff's Reply to Defendants' Cross Motions (Doc. # 17), filed March 27, 1997, at 5.[30] As the unsworn statement is not sufficient to defeat the summary judgment motion, however, Plaintiff has not met her burden to defeat summary judgment and, accordingly, Defendants' motion for summary judgment to dismiss this issue will be granted.

In sum, summary judgment dismissing all of Plaintiff's federal claims is granted.

### 4. *Motion for Leave to File a Second Amended Complaint*

Plaintiff has moved for leave to file a second amended complaint asserting the same claims against the individual police officers in their individual capacities. Plaintiff's Notice of Motion to Amend (Doc. # 7), filed January 31, 1997. Fed.R.Civ.P. 15(a) provides that after the time in which to amend a pleading as a matter of course has elapsed

.... a party may amend the party's pleadings only by leave of court or by written consent of the adverse party; and leave to amend shall be freely given when justice so requires....

Fed.R.Civ.P. 15(a).

 Further, the Supreme Court has directed that "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rule requires, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Whether to permit amendment is within the court's discretion, although a denial of leave to amend that is not based on valid ground is an abuse of discretion. *Burns v. Imagine Films En-*

*tertainment, Inc.*, 165 F.R.D. 381, 384 (W.D.N.Y.1996). A court, however, should not grant leave to amend when the proposed amendment is legally insufficient on its face because such amendment would be futile. *Peirez, Ackerman & Levine v. Starr*, 1994 WL 48811, at *2 (S.D.N.Y.1994) ("A futile amendment is one that is clearly frivolous or advances a claim that is legally insufficient on its face, suggesting no colorable grounds for relief").

 Whether a proposed amendment would be futile is analyzed according to whether the proposed amendment states a claim for which relief can be granted under Fed.R.Civ.P. 12(b)(6). *Ragin v. Harry Macklowe Real Estate Co.*, 126 F.R.D. 475, 478 (S.D.N.Y.1989). Thus, in determining whether the proposed amended complaint is futile, the court must construe the facts alleged by the moving party as true and in the light most favorable to him. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Unless it appears beyond a doubt that the party moving to amend can prove no set of facts in support of the proposed amended claim entitling him to relief, the motion to amend should be granted. *Scheuer, supra; Ragin, supra.*

 In the proposed Second Amended Complaint, Plaintiff asserts no new allegations regarding the actions of the individual police officers, but rather identifies by name the previously unknown police officers involved in the events of February 5, 1994, surrounding Santos's arrest and subsequent suicide. Significantly, none of the allegations in either the Amended Complaint or the proposed Second Amended Complaint describes any action of any individual police officer as being beyond the scope of their employment. Instead, Plaintiff consistently describes the individual police officers as "**AGENTS**" of Defendant City in both the Amended Complaint and the Proposed Second Amended Complaint. Amended Complaint; Proposed

---

**30.** Plaintiff also baldly states that the Ortiz Statement is sworn, although there is no indication either In the statement itself or in a later submission that Ortiz's statement was made under oath. Plaintiff's Reply to Defendants' Cross Motions (Doc. # 17), filed March 27, 1997, at 5 ("At-

tached hereto as Exhibit "F" is the *sworn* statement of José Ortiz, the other individual taken into custody by Officer Thiebolt") (emphasis added). As discussed, *see* Discussion, *supra*, at 457–58, an examination of the document reveals no basis for this assertion.

Second Amended Complaint (emphasis in original). As it is apparent from the Discussion, *supra*, at 455–66, that there are no facts on which such a theory of liability could be based, Plaintiff's proposed Second Amended Complaint is legally insufficient on its face and Plaintiff's motion for leave to file such must be denied as futile.

### 5. *Remaining Motions*

As the court has denied Plaintiff's motion to amend the complaint, denied Plaintiff's motion for partial summary judgment and granted summary judgment in favor of Defendants as to all the claims contained in the Amended Complaint, the remaining motions, including Defendants' motion to compel, Plaintiff's motion to compel, Plaintiff's motion to amend the scheduling order, Plaintiff's motion to compel and extend the period within which to identify experts and Plaintiff's motion to amend the scheduling are all dismissed as moot.

### *CONCLUSION*

Based on the foregoing, Plaintiff's motion for leave to file a second amended complaint (Doc. # 7) is DENIED; Defendants' cross-motion for summary judgment and dismissal of the complaint (Doc. # 10) is GRANTED; Defendants' cross-motion to compel discovery (Doc. # 10) is DISMISSED as moot; Plaintiff's cross-motion for partial summary judgment (Doc. # 23) is DENIED; Plaintiff's motion to amend the scheduling order (Doc. # 28) is DISMISSED as moot; Plaintiff's motion to compel and extend the period within which to identify experts (Doc. # 30) is DISMISSED as moot; Plaintiff's motion to amend the scheduling order (Doc. # 34) is DISMISSED as moot; and Defendants' motion for summary judgment (Doc. # 36) is GRANTED.

SO ORDERED.